575 F.2d 1340
 83 Lab.Cas. P 10,585
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
National Labor Relations Board, Petitioner
v.
Custom Excavating, Inc., Respondent
 No. 77-1495.
 United States Court of Appeals, Seventh Circuit.
 March 9, 1978.*
 
 Before CUMMINGS, SPRECHER and WOOD, Circuit Judges.
 
 PER CURIAM
 
 1
 In February 1977, the National Labor Relations Board ordered respondent Custom Excavating Company to cease and desist from refusing to bargain with Local 139 of the International Union of Operating Engineers, AFL-CIO, by "refusing to furnish or make available to the Union the names and addresses of its customers during 1975 for whom work was performed with construction equipment, and the dates such work was performed for said customers."[1] The Board's decision and order are reported at 228 NLRB No. 38. The Board has applied to us for enforcement of this order. With a minor modification, the application is granted.
 
 
 2
 An Administrative Law Judge heard this case in Milwaukee, Wisconsin, in late July and early August 1976 upon a regional director's complaint based upon a charge filed by the Union. The complaint alleged that since January 14, 1976, the Union has unsuccessfully requested the Company "to furnish it with documentary evidence containing the names and addresses of Respondent's customers during 1975, for whom work was done by Respondent's unit employees (operating engineers), and the dates such work was performed by Respondent for said customers." According to the complaint, the Union needed that information to process grievances filed against the Company, including one filed on January 8, 1976, which asserted that the Company had not paid appropriate amounts to its operating engineers for wages and fringe benefits under the then collective bargaining agreement. In its answer the Company admitted that the Union was the bargaining representative for its operating engineers and alleged that it was willing to supply the information requested "under circumstances which would assure that the Union would not contact [its] customers nor have an opportunity to harass them." The Company also claimed that the remedy sought by the Union would enable it to harass the Company's customers. The Administrative Law Judge found that the Company was engaged in the construction industry and conducts grading and excavating operations from its Glendale, Wisconsin, location. He noted that the Company recognized the Union as the exclusive representative of its operating engineer employees in an appropriate unit under the collective bargaining agreement. His pertinent findings may be summarized as follows:
 
 
 3
 On Saturday, September 13, 1975, Robert Retzack, the Union's business representative, was visiting jobsites to check whether employer members of the Wisconsin Excavators and Graders Association were violating the collective bargaining agreement with the Union. He noticed that union member Gerald Thimke, a Company employee, was excavating blacktop from a driveway and parking area at 11:30 that morning and that the work was still in process at 12:30 p.m. but had been completed before 3:00 p.m. Consequently, a month later, Retzack telephoned company president Ronald Grimm and told Grimm that Retzack had reason to believe that the Company was not compensating its operating engineers properly under the collective bargaining contract. Therefore, he asked to inspect the payroll records for that month, but Grimm said he was too busy to comply with the request and that he was not sure the Union had the right to obtain the information. This prompted Retzack to write Grimm that in the absence of a satisfactory response by November 15, 1975, the Union would seriously consider filing a charge with the Labor Board.
 
 
 4
 When Retzack telephoned Grimm about this same matter on January 6, 1976, Grimm agreed to let Retzack look at September 1975 records on the following day. At that time, he showed Retzack the records for two of its operating engineers, Thimke and Thomas Wegner, apparently the only persons then in the bargaining unit (Company Br. 4, 5). No hours worked were shown for Thimke on September 13. After inspecting those records, Retzack told Grimm that they were "a patent fraud"[2] and demanded that the operating engineers be paid in accordance with the labor agreement. At this same meeting, Retzack asked Grimm for a complete record of all payroll dates with respect to the Company's operating engineers for 1975, including a complete list of the customers for whom the Company had done work which involved the operation of construction equipment in 1975. Retzack said otherwise the Union would file a grievance with respect to the allegedly fraudulent nature of the Company's time records. Grimm replied that he had no such detailed information.
 
 
 5
 Retzack spoke to former Company employee Donald Shrader on January 9 and with another former employee, Dan Hill, on February 4. They said the Company had not paid them overtime and that they were required to submit two time cards to the Company, one in detail and the other blank, so that Company could use the blank time card "to reconstruct the hours so as to comply with the contract and the [minimum wage or 'fair hour'] law."
 
 
 6
 Because Retzack had not received the requested information by February 25, he wrote Company counsel stating that the Union would file an unfair labor practice charge with the Labor Board unless the information were conveyed to the Union in timely fashion. Company counsel replied, expressing surprise that the Union would be seeking information to support its January 8, 1976, grievance and stating that he would write the Company about Retzack's February 25 request. Since no satisfaction was received, the Union filed its charge on March 19, soon thereafter arbitration of the grievance was postponed indefinitely, and the Labor Board's regional director filed this complaint on May 10.
 
 
 7
 At the ensuing hearing before the Administrative Law Judge, Retzack testified that the Union considered the requested information essential to prove "the patently fraudulent nature of the payroll records that are a product of a collusive relationship with two employees; namely, Thomas Wegner and Gerald Thimke, and * * * [company president] Ronald Grimm." After receiving such information, Retzack said the Union would contact the Company's customers in order to compare the dates, times, and places where the Company's unit employees worked with data obtained from the Company's payroll records.
 
 
 8
 The Administrative Law Judge rejected the Company's initial defense that its customers do not have the appropriate records, deciding that the Union should be permitted to ascertain this matter with the customers. Although the Company argued that if it submitted the information sought the Union would subject the Company's customers to harassment and thus cause the Company to lose business, the Administrative Law Judge rejected this argument as speculative and unsubstantiated. He stated that if the Company could show any such harassment, it would have adequate remedies in the courts. The Union would be well advised to conduct itself accordingly.
 
 
 9
 The Administrative Law Judge concluded that the Company had refused to bargain in good faith with the Union by refusing to furnish it with documentary evidence containing the names and addresses of its customers during 1975 for whom work was done with construction equipment, as well as the dates on which such work was performed. He determined that the requested information was potentially relevant and material in connection with the Union's January 8 grievance and stated that the record contained no evidence that the Union would utilize the requested information improperly. Because of the foregoing testimony of employees Shrader and Hill, he decided that it was reasonable for the Union to contact the Company's customers directly concerning these matters instead of through some independent third party. He concluded that the Company had violated Section 8(a)(5) and (1) of the Act (29 U.S.C. Sec. 158(a)(5) and (1)) and recommended a remedial order and the posting of a prescribed notice by the Company.
 
 
 10
 The Labor Board affirmed the Administrative Law Judge except that it separately stated his conclusions of law. The Board also made stylistic changes in the recommended notice.
 
 
 11
 The Company's principal argument is that the National Labor Relations Act does not require disclosure of a customer list. We disagree. National Labor Relations Board v. Truitt Mfg. Co., [30 LC p 69,932] 351 U.S. 149, authoritatively established that an employer violates Section 8(a)(5) of the Act if it refuses to give the union information that it needs as the bargaining representative of a group of employees. Here the Company's records failed to record any hours worked by Thimke on Saturday, September 13, although the Union's business representative saw him working that day. Two former employees of the Company corroborated the Union's suspicion of undercompensation by telling Retzack about the Company's use of two time cards, one in detail and the other blank, and that they never received overtime pay. It therefore became appropriate for the Union to check with the Company's customers to determine whether the Company was falsifying payroll records as contended in the Union's January 8 grievance. It is well settled that an employer must give information to a union when, as here, it may be useful as to a pending grievance. National Labor Relations Board v. Acme Industrial Co., 385 U.S. 432, 437-438. As in Texaco, Inc. v. National Labor Relations Board, 407 F.2d 754, 758 (7th Cir.1969), and National Labor Relations Board v. Northwestern Publishing Co., 343 F.2d 521, 525 (7th Cir.1965), because of the need for verification, it is immaterial that the Union might secure some overtime information from its own members. While the Company attempted to show that some of its customers would be unwilling or unable to supply information to the Union relevant to its grievance, under Acme Industrial Co., supra, the Union is at least entitled to attempt to bolster its case through the customers. Whether it will succeed or not is not an issue here. Similarly, the Company's implicit argument that its employees were properly paid because, among other facts alleged, independent auditors found "no deficiencies" does not mean that the Union can be denied relevant evidence to make a contrary argument, at least when some support exists for the Union's position.[3]
 
 
 12
 Since the Administrative Law Judge found that the claims of harassment and slander were speculative and unsubstantiated and the Company offers no reason for us to disturb that finding,[4] the Union's request cannot be avoided based on the Company's asserted need for confidentiality nor is there a need to require that the information be furnished to a disinterested third party. National Labor Relations Board v. Detroit Edison Co., 560 F.2d 722, 726 (6th Cir.1977). Indeed if there was any firm Company offer to permit a third party to obtain wage information from its customers for the Union (see Company Br. 14), the Company's prior stalling over several months made it too late and of doubtful satisfactoriness. Compare Emeryville Research Center v. National Labor Relations Board 441 F.2d 880, 886 (9th Cir.1971). Therefore, the Board properly concluded that the Company had violated its duty to bargain in good faith in violation of Section 8(a)(5) and (1).
 
 
 13
 The Company relies principally on two Ninth Circuit cases denying enforcement. But in Emeryville Research Center v. National Labor Relations Board, 441 F.2d 880 (9th Cir.1971), the union refused to specify its needs for the company material, the company's objection was credited by the trial examiner and the company made a timely and specific offer to the union to provide sufficient information. Here the Union explained that the records were needed in order to process its January 8 grievance, and nevertheless the Company kept refusing to turn over the information sought based on an unsubstantiated objection, necessitating the Union's March 19th unfair labor practice charge. In Shell Oil Company v. National Labor Relations Board, 457 F.2d 615 (9th Cir.1972), the union sought the names and addresses of all the company's unit employees, whether or not union members. The union's district director admitted that the information would be conveyed to officers of six of its locals, to various committees and clerical personnel. Enforcement was denied because the company had made reasonable and timely information counter-proposals and because its non-union employees had been previously subjected to violence by union sympathizers. Neither factor is present here.[5]
 
 
 14
 The Company faults the Administrative Law Judge for having considered hearsay testimony from Retzack concerning his conversation with former company employees Shrader and Hill. Since this testimony was not submitted to show the truth or falsity of the Company's records but rather to show that the Union had a basis for its request, it was of course not hearsay. See, e.g., Rule 801(c) of the Federal Rules of Evidence.
 
 
 15
 The Company contends that the Board should not have asserted jurisdiction even though the Company performed services in excess of $50,000 for customers who purchased and received, or shipped and sold goods in excess of $50,000 outside of Wisconsin. However, Section 10(a) of the Act empowers the Board to prevent the commission of unfair labor practices by "any persons * * * affecting commerce" (29 U.S.C. Sec. 160(a)). Since the Company admittedly dealt with customers in commerce and therefore exerted an indirect effect on commerce, its assertion of jurisdiction was proper. National Labor Relations Board v. Reliance Fuel Oil Corporation, 371 U.S. 224, 226-227. There is no showing that the Board abused its discretion in exercising its statutory jurisdiction here. See Local Union No. 12, Progressive Mine Workers of America, District No. 1 v. National Labor Relations Board, 189 F.2d 1, 4 (7th Cir.1951), certiorari denied, 342 U.S. 868.
 
 
 16
 The Company also complains that the Administrative Law Judge should have admitted evidence that members of the industry would not have the requested records or would not permit the Union to examine them. However, the information sought appears to be relevant and useful in the Union's performance of its statutory functions and therefore should be produced. As the Board states (Br. 11, n. 8), it is not appropriate at that stage to secure the proof to support its January 8, 1976, grievance, for it is presently entitled to this information in the nature of discovery in aid of the grievance. National Labor Relations Board v. Acme Industrial Co., supra.
 
 
 17
 One of the Company's exceptions to the Administrative Law Judge's decision, reiterated with respect to the Board's order, was that the Board's order is overly broad in its employment of the term "construction equipment." As noted, the Board has ordered the Company to cease and desist from refusing to bargain with the Union by refusing to furnish or make available to the Union the names and addresses of its customers during 1975 "for whom work was performed with construction equipment," and the dates such work was performed for said customers. As the Company has explained without contradiction (Br. 31), it obtains 80 per cent of its revenue from the trucking business, and its trucks are not driven by operating engineers. Moreover, the complaint sought only "documentary evidence containing the names and addresses of Respondent's customers during 1975, for whom work was done by Respondent's unit employees [operating engineers] and the dates such work was performed by Respondent for such customers." The Company's exception is well taken, for there is no showing that the Union needs a list of all the Company's customers. Therefore, the order will be modified by substituting the phrase "for whom work was done by its unit employees" for the phrase "for whom work was performed with construction equipment." As modified, the Board's order will be enforced.
 
 
 
 *
 This appeal was originally decided by unreported order on March 9, 1978. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion
 
 
 [1]
 In connection with the above relief, the Board also ordered the Company to cease interfering with its employees' rights under Section 7 of the Act (29 U.S.C. Sec. 157)
 
 
 [2]
 Retzack testified that no hours worked were shown for Thimke on September 13
 
 
 [3]
 In any event, the Company's argument that its records have been verified as accurate seems unconvincing because the testimony indicates that neither the accountant nor the auditors that the Company relies upon compared wages paid to time cards or to customer billing
 
 
 [4]
 While the record shows that the Union told some employers that the Best Cranes Company did not have a contract with the Union, that falls short of proving a "great likelihood of harm flowing from the disclosure" (National Labor Relations Board v. Detroit Edison Co., 560 F.2d 722, 726 (6th Cir.1977)), particularly in light of the Administrative Law Judge's refusal to credit the allegations by the Company and the Best Cranes Company about the Union's conduct
 Because the Company therefore presented no persuasive evidence of potential harm, we need not decide whether the standard for requiring disclosure limited to third parties differs from the standard for complete confidentiality. Cf. Detroit Edison, supra, at 726.
 
 
 [5]
 The Company also relies on American Needle, 206 NLRB 534 (1973) and Betty Brooks, 99 NLRB 1237 (1952). In the former, the Board required the employer "to provide the Union, upon request, with relevant information to bargain over the decision to transfer unit work" because of a projected plant closing. It did not discuss the Administrative Law Judge's conclusion that the employer had no duty to provide a list of customers and competitors to the Union. In light of the authorities discussed herein, we disagree with that conclusion. In Betty Brooks the union admitted that a list of the employer's subcontractors would not assist it in bargaining with the employer